## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| LDK SOLAR CO. LTD. (IN PROVISIONAL LIQUIDATION),[1] | Case No. 14-12387 (PJW) |
| Debtor in a Foreign Proceeding. | **Hearing Date: Nov. 21, 2014 at 2:00 p.m. (ET)**<br>**Objection Deadline: Nov. 14, 2014 at 4:00 p.m. (ET)** |

## MOTION OF FOREIGN REPRESENTATIVES FOR AN ORDER RECOGNIZING AND ENFORCING THE SCHEME OF ARRANGEMENT AND THE ORDER OF THE CAYMAN COURT SANCTIONING THE SCHEME OF ARRANGEMENT UPON RECOGNITION OF THE CAYMAN PROCEEDING

Eleanor Fisher and Tammy Fu of Zolfo Cooper (Cayman) Limited, in their capacity as Joint Provisional Liquidators and authorized foreign representatives (in such capacity, the "JPLs" or "Foreign Representatives") of LDK Solar CO., Ltd. (in provisional liquidation) ( "LDK Parent") in a proceeding (the "Cayman Proceeding") under Part V of the Cayman Islands Companies Law (2013 Revision) (the "Cayman Companies Law") pending before the Grand Court of the Cayman Islands, Financial Services Division (the "Cayman Court"), by and through the undersigned counsel to the JPLs on behalf of LDK Parent, hereby submit this motion (the "Motion") pursuant to sections 105(a), 1507, and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), for entry of an order (the "Enforcement Order"), substantially in the form attached hereto as Exhibit A, upon recognition of the Cayman Proceeding, granting recognition of and giving effect to the Cayman Scheme and the Sanction Order (each as defined below) in the United States of America (the "United States"). In support hereof, the Foreign Representatives respectfully refer the Court to (a) the *Declaration of Tammy*

---

[1] The last four digits of the Cayman Islands registration number of LDK Solar CO., Ltd (in provisional liquidation) are 6736. The mailing address for LDK Solar CO., Ltd. (in provisional liquidation) is: Zolfo Cooper (Cayman) Limited, Attn: Eleanor Fisher & Tammy Fu, as Joint Provisional Liquidators, P.O. Box 77GT, 38 Market Street, Camana Bay, Grand Cayman KY1-9006.

*Fu in Support of (I) Chapter 15 Petition of LDK Solar CO., Ltd. (In Provisional Liquidation) and (II) Motion of Foreign Representatives for (A) Recognition of the Cayman Proceeding as a Foreign Main Proceeding or, in the Alternative, as a Foreign Nonmain Proceeding, and (C) Certain Related Relief*, [Docket No. 2] (the " First JPL Declaration"), (b) the *Declaration of Jonathan Guy Manning in Support of (A) Chapter 15 Petition of LDK Solar CO., Ltd. (In Provisional Liquidation) For Recognition of Foreign Main Proceeding and (B) Motion for (I) Provisional Relief, (II) Recognition of the Cayman Proceeding as a Foreign Main Proceeding and (III) Certain Related Relief* [Docket No. 3] (the "First Manning Declaration"), (c) the *Declaration of Jonathan Guy Manning in Support of Motion of Foreign Representatives for an Order Recognizing and Enforcing the Scheme of Arrangement and the Order of the Cayman Court Sanctioning the Scheme of Arrangement Upon Recognition of the Cayman Proceeding,* filed concurrently herewith (the "Second Manning Declaration" and, together with the First Manning Declaration, the "Manning Declarations"), and (d) the *Declaration of Tammy Fu in Support of Motion of Foreign Representatives for an Order Recognizing and Enforcing the Scheme of Arrangement and the Order of the Cayman Court Sanctioning the Scheme of Arrangement Upon Recognition of the Cayman Proceeding,* filed concurrently herewith (the "Second JPL Declaration" and, together with the First JPL Declaration, the "JPL Declarations"), each of which is incorporated herein by reference.  In further support hereof, the Foreign Representatives respectfully represent as follows:

## PRELIMINARY STATEMENT[2]

   1.  LDK Parent is in the final stages of its global balance sheet restructuring, which has the overwhelming support of its creditor constituencies.  The JPLs have commenced

---

[2] Unless otherwise provided, capitalized terms used but not defined in this Preliminary Statement section shall have the meanings ascribed to them elsewhere in this Motion.

this Chapter 15 Case, and the Chapter 11 Debtors[3] concurrently commenced the Chapter 11

Cases, in order to fully implement the terms of their global restructuring.  LDK Parent's global

restructuring is the result of several months of negotiations among LDK Parent's management,

the JPLs, on behalf of LDK Parent, and many of LDK Parent's key stakeholders, including

holders of the RMB-Denominated US$-Settled 10% Senior Notes due 2014 (the "Senior Notes")

issued by LDK Parent pursuant to the Senior Note Indenture (as defined in the Explanatory

Statement), and holders of the 240,000,000 Series A Redeemable Convertible Preferred Shares

of LDK Silicon issued in June 2011 for a total consideration of US$240,000,000 plus IRR

accrued and less dividends received (the "Preferred Obligations").  The terms of LDK Parent's

restructuring are reflected in the proposed scheme of arrangement presented to the Cayman

Court under FSD Cause No. 97 of 2014 - AJJ pursuant to section 86 of the Companies Law

(2013 Revision) between LDK Solar CO., Ltd. (in provisional liquidation) and the Scheme

Creditors (as defined below) as applicable (the "Cayman Scheme").[4]  The Cayman Scheme has

been widely noticed and distributed and, as set forth in further detail below, was overwhelmingly

approved by the Senior Note Scheme Creditors (99% by value and 97% by number), the

Preferred Obligation Scheme Creditors (79% by value and 80% by number), and the Ordinary

Scheme Creditors (100% by value and number), the only constituencies "impaired" by the

proposed reorganization of LDK Parent.

>    2.    The Cayman Court has scheduled a hearing on November 6, 2014 (the

"Sanction Hearing") in order to consider the Cayman Scheme and, if approved, enter an order

---

[3] Contemporaneously with the filing of LDK Parent's chapter 15 petition, certain of LDK Parent's United States subsidiaries, LDK Solar Systems, Inc., LDK Solar USA, Inc., and LDK Solar Tech USA, Inc. (the "Chapter 11 Debtors") each commenced cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases") by filing voluntary petitions with this Court.  The Chapter 11 Cases are jointly administered at Case No. 14-12384.

[4] The Cayman Scheme has been widely distributed and approved by creditors.  LDK Silicon & Chemical Technology Co., Ltd., ("LDK Silicon" and, together with LDK Parent, the "Cayman Scheme Companies") has also proposed a scheme of arrangement under section 86 of the Companies Law.

01:16266978.1

sanctioning and approving the Cayman Scheme (the "Sanction Order").  Upon entry of the

Sanction Order by the Cayman Court, and prior to the Recognition Hearing, the Foreign

Representatives intend to file an additional pleading in this Chapter 15 Case setting forth the

results of the Sanction Hearing and the Sanction Order with this Court.

　　　　3.　　　Pursuant to the terms of the Cayman Scheme, creditors under the Cayman

Scheme (the "Scheme Creditors") will generally receive, at the election of the individual Scheme

Creditor, either (a) cash (to the extent available for certain classes of Scheme Creditors), or (b) a

combination of one of two series of new convertible bonds and equity in LDK Parent.  The

significant recoveries provided to Scheme Creditors are in exchange for the release of certain

parties to the Cayman Scheme, including LDK Parent, the guarantors under the Senior Notes (the

"Senior Notes Guarantors"),[5] which includes certain of the Chapter 11 Debtors, and certain of

the obligors under the Preferred Obligations (the "Preferred Obligors").[6]

　　　　4.　　　Three critical steps remain in order to implement LDK Parent's global

restructuring: (i) entry of the Sanction Order, (ii) recognition of the Cayman Proceeding as a

foreign main proceeding under chapter 15 of the Bankruptcy Code, and (iii) entry of the

Enforcement Order.  Following these three steps, LDK Parent, the Chapter 11 Debtors, and the

rest of the Group will be able to finalize their restructuring.[7]  For all of the reasons set forth

below, enforcement of the Cayman Scheme as requested herein is necessary for LDK Parent's

---

[5] The "Senior Note Guarantors" consist of LDK Solar USA, Inc., LDK Solar International Company Limited, LDK Solar Europe Holding S.A., LDK Solar Italia S.R.L (in liquidation), LDK Trading Service Germany GmbH, LDK Solar Hi-Tech (Hong Kong) Co, Limited, LDK Solar Tech USA, Inc., LDK Solar Spain S.L and LDK PV Tech (Hong Kong) Co., Limited.

[6] The "Preferred Obligors" consist of LDK Parent, LDK Silicon, LDK Silicon Holding, Jiangxi LDK Solar Polysilicon Co., Ltd, and Jiangxi LDK PV Silicon Technology Co., Ltd and Jiangxi LDK Solar High-Tech Co., Ltd. Mr. Peng Xiaofeng also provided a personal guarantee in respect of the Preferred Obligations, but, for the avoidance of doubt, Mr. Peng Xiafeng is not being released under the terms of the Cayman Scheme.

[7] Subject to the satisfaction of the remaining condition precedents contained in the Cayman Scheme to the extent not waived in accordance with the terms of the Cayman Scheme.

restructuring, is not manifestly contrary to the public policy of the United States, promotes the

policy of objectives of chapter 15 of the Bankruptcy Code, aids in the orderly distribution of

consideration to creditors in a manner consistent with the priorities under the Bankruptcy Code,

and furthers the important principles of comity and international cooperation.

<u>**STATUS OF THE CASE AND JURISDICTION**</u>

5.      On February 21, 2014, LDK Parent commenced the Cayman Proceeding

by making a filing in the Cayman Court for the appointment of joint provisional liquidators.  On

February 27, 2014, the Cayman Court entered an order (the "<u>Cayman Order</u>") appointing the

JPLs.

6.      On October 21, 2014 (the "<u>Petition Date</u>"), the JPLs, as Foreign

Representatives, commenced this case (the "<u>Chapter 15 Case</u>") by filing a petition for relief

under chapter 15 of the Bankruptcy Code (the "<u>Chapter 15 Petition</u>").  The Foreign

Representatives have sought recognition of the Cayman Proceeding as a foreign main proceeding

or, in the alternative, as a foreign nonmain proceeding.  A hearing on recognition of the Cayman

Proceeding (the "<u>Recognition Hearing</u>") is scheduled to take place on November 21, 2014 at

2:00 p.m. (Eastern Time).

7.      On October 22, 2014, the Court entered an order [Docket No. 20] (the

"<u>Provisional Relief Order</u>") (i) enforcing the Cayman Order in the United States on an interim

basis, and (ii) applying section 362 of the Bankruptcy Code on an interim basis pursuant to

sections 105(a), 1519(a)(3) and 1521(a)(7) of the Bankruptcy Code to LDK Parent and the

property of LDK Parent within the territorial jurisdiction of the United States.

8.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).[8]

9.     The statutory and legal predicates for the relief requested herein are sections 105(a), 1507, and 1521 of the Bankruptcy Code.

## BACKGROUND OF THE CAYMAN SCHEME

### I.     The Cayman Scheme

10.     On August 29, 2014, the JPLs filed a copy of the Cayman Scheme and a petition for the Cayman Scheme (as well as the LDK Silicon scheme arrangement) with the Cayman Court (the "Scheme Petition").  A copy of the Scheme Petition is attached to the Second JPL Declaration as Exhibit D.  In general, the Cayman Scheme provides consideration to three main classes of Scheme Creditors entitled to vote on the Cayman Scheme: (i) holders of Senior Notes and any person with an interest in the Senior Notes (the "Senior Note Scheme Creditors"), (ii) holders of Preferred Obligations (the "Preferred Obligation Scheme Creditors"), and (iii) holders of other general unsecured claims against LDK Parent, other than Senior Notes claims, Preferred Obligation claims, intercompany claims or certain other claims as set forth in the Cayman Scheme (the "Ordinary Scheme Creditors").  These classes of Scheme Creditors generally receive the following consideration under the Cayman Scheme:

    i.   Senior Note Scheme Creditors.   Under the Cayman Scheme, Senior Note Scheme Claims (as defined in the Cayman Scheme) are released in full and each Senior Note Scheme Creditor may choose two alternative treatment elections:

---

[8] The Foreign Representatives consent, pursuant to rule 9013-1(f) of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

01:16266978.1

A.   the "Senior Note Non-Cash Scheme Consideration" comprised of (a) equity interests in LDK Parent in an amount equal to, at the election of the Senior Note Scheme Creditor, 8.736% to 15% of such Senior Note Scheme Creditor's claim, calculated at a price of $1.586 per equity unit, and (b) new convertible bonds equal to the remainder of such Senior Note Scheme Creditor's claim amount; or

B.   if there is sufficient cash for such distribution, up to 10% of such Holder's Claim in cash, subject to a cap.[9]

ii.   <u>Preferred Obligation Scheme Creditors</u>.    Under the Cayman Scheme, Preferred Obligation Scheme Claims (as defined in the Cayman Scheme) are released in full and each Preferred Obligation Scheme Creditor may choose to elect, in its Capitalisation Request Form:

A.   The "Cash Option", permitting such Scheme Creditor to receive up to 10% of such creditor's claim in cash (if available), subject to a cap, in full and final satisfaction of its Preferred Obligation Scheme Claim;[10] or

B.   The "Non-Cash Option" comprised of (a) equity interests in LDK Parent in an amount equal to, at the election of the Holder, 8.736% to 15% of such Preferred Obligation Scheme Creditor claim, calculated at a price of $1.586 per equity unit, and (b) new convertible bonds equal to the remainder of such Preferred Obligation Scheme Creditor claim amount.

iii.   <u>Ordinary Scheme Creditors</u>.    Under the Cayman Scheme, the claims of Ordinary Scheme Creditors are released in full and each holder of an Ordinary Scheme claim, as calculated as of the "Record Time"[11] under the Cayman Scheme, (an "<u>Admitted Ordinary Scheme Creditor</u>") may choose to elect in whole or in part:

---

[9] Under the Cayman Scheme, LDK Parent is not obligated to make funds available for cash distributions to Senior Note Scheme Creditors.

[10] Under the Cayman Scheme, LDK Parent is not obligated to make funds available for cash distributions to Preferred Obligation Scheme Creditors.

[11] In the Cayman Scheme, "Record Time" means 11:00 a.m. (Cayman Islands time) on October 15, 2014.

A. The "Cash Option", permitting such Admitted Ordinary Scheme Creditor to receive up to 5% of such creditor's claim in cash, subject to a cap, in full and final satisfaction of its Admitted Ordinary Scheme claim; or

B. The "Non-Cash Option" comprised of (a) equity interests in LDK Parent in an amount equal to 15% of such Admitted Ordinary Scheme Creditor's claim, calculated at a price of $1.586 per equity unit, and (b) new convertible bonds equal to the remainder of such Admitted Ordinary Scheme Creditor's claim amount.

11.     In addition, certain of the principal compromises and arrangements to be given effect by the Cayman Scheme are:[12]

i. the release in full of claims of the Senior Note Scheme Creditors against, among others, LDK Parent and the Senior Note Guarantors (which includes two of the Chapter 11 Debtors) in consideration for the distribution provided to Senior Note Scheme Creditors under the Cayman Scheme, as described above;

ii. the release in full of claims of the Preferred Obligation Scheme Creditors against, among others, LDK Silicon and the Preferred Obligors in consideration for the distribution provided to Preferred Obligation Scheme Creditors under the Cayman Scheme;

iii. the release in full of claims of the Ordinary Scheme Creditors against LDK Parent in consideration for the distribution provided to Ordinary Scheme Creditors under the Cayman Scheme; and

iv. Giving effect to the RSAs, which have the following objectives:

A. to avoid placing the Cayman Scheme Companies and other members of the Group into bankruptcy or Official Liquidation (or another insolvency process) at some point in the near future, as a result of which the anticipated recoveries for Scheme Creditors could be significantly less than if the Restructuring Proposal were to be completed successfully;

B. implement a new, more appropriate capital structure so that the Group will possess a strengthened

---

[12] Unless otherwise defined herein, all defined terms in this paragraph shall have the meaning ascribed to them in the Explanatory Statement.

01:16266978.1

> balance sheet and a level of debt that is more likely to be serviceable in the future; and
>
> v.  effect a cash injection of approximately US$29 million in new money pursuant to the terms of the Exit Funding Arrangements; and increase the prospect of generating long-term value for Scheme Creditors and other stakeholders.

(Sec. JPL Decl. ¶ 20.)

12.     As noted above, the Cayman Scheme includes certain releases of non-debtor parties by Scheme Creditors, whether or not such Scheme Creditors voted to accept or reject the Cayman Scheme.  The Cayman Scheme contemplates that the Scheme Creditors will release, among others, (a) any claims against the non-debtor Senior Note Guarantors (as listed in footnote 5 herein) related to such entities' guarantees of LDK Parent's Senior Notes  and (b) certain non-debtors (as listed in footnote 6 herein) in respect of their guarantee of the Preferred Obligations. See, e.g., Explanatory Statement section 7.16(ll), Cayman Scheme Clause 14.1.

## II.     Solicitation of the Cayman Scheme

13.     On September 12, 2014, the Cayman Court held a hearing on the application of the Cayman Scheme Companies seeking an order from the Cayman Court convening creditor meetings (the "Convening Hearing") to consider and ultimately approve proposed schemes of arrangement in respect of the Cayman Scheme Companies under section 86 of the Companies Law (which includes the Cayman Scheme for LDK Parent and a separate scheme of arrangement for LDK Silicon ).  (Sec. JPL Dec. ¶ 7).  Notice of the Convening Hearing was provided to Scheme Creditors by means of a "practice statement" letter (the "Practice Statement Letter"), dated September 5, 2014. The Practice Statement Letter set out the date of the Convening Hearing, a brief summary of the Cayman Scheme Companies' restructuring proposal and the proposed class composition.  The Practice Statement Letter also invited Scheme Creditors to object to the restructuring proposal or proposed class composition

01:16266978.1

by September 10, 2014 and to attend the Convening Hearing.  The Practice Statement Letter was

transmitted to Scheme Creditors by:

    i.   sending an email to each Scheme Creditor for which the JPLs hold an email address on September 5, 2014;

    ii.   making it available on the Cayman Scheme website administered by the JPLs (www.ldksolar-provisionalliquidation.com) (the "Scheme Website") on or about September 5, 2014; and

    iii.   notification to Senior Note Scheme Creditors through Euroclear Bank S.A./N.V., as operator of the Euroclear clearing system ("Euroclear") and Clearstream Banking, société anonyme ("Clearstream" and, together with Euroclear, the "Clearing Systems") on or about September 8, 2014.

(Sec. JPL Dec. ¶ 8-9.)

    14.   Following the Convening Hearing, on September 12, 2014, the Cayman

Court issued an order (the "Convening Order"), ordering that meetings of classes of Scheme

Creditors (collectively, the "Scheme Class Meetings") were to be held at the office of Campbells,

the JPLs' Cayman Islands counsel, as follows:

    i.   the "LDK Silicon CI Preferred Meeting," on October 16, 2014 at 8:00 p.m. (Cayman Islands time) / October 17, 2014 at 9:00 a.m. (Hong Kong time);

    ii.   the "LDK Solar CI Preferred Meeting," on October 16, 2014 at 8:10pm (Cayman Islands time) / October 17, 2014 at 9:10 a.m. (Hong Kong time);

    iii.   the "CI Senior Note Meeting" on October 16, 2014 at 8:20pm (Cayman Islands time)/ 17 October 2014 at 9.20 am (Hong Kong time); and

    iv.   the "LDK Solar CI Ordinary Meeting" on October 16, 2014 at 8:30 pm (Cayman Islands time)/ October 17, 2014 at 9.30am (Hong Kong time)

(Sec. JPL Dec. ¶ 10.)

15.     The Convening Order provided that the chairperson for the Scheme Class Meetings was to be either of the JPLs.  In addition, the Sanction Hearing was set for November 6, 2014, at 9:30 a.m. (Cayman Islands time).  (Sec. JPL Dec. ¶ 11.)

16.     Pursuant to the terms of the Convening Order, notice of the Scheme Class Meetings and the Cayman Scheme solicitation was provided as follows:[13]

>    i.     Notice was provided by email to each Scheme Creditor for which the JPLs hold an email address;
>
>    ii.    Notice was provided on the Scheme Website, published on September 17, 2014;
>
>    iii.   Notification was provided through the Clearing Systems on September 17, 2014; and
>
>    iv.    Notice was provided via publication in the *Cayman Compass* on September 23, 2014, and the *South China Morning Post* and the *Wall Street Journal* (including the International Edition) on September 24, 2014.

(Sec. JPL Decl. ¶ 12.)

17.     In addition, following the Convening Hearing and issuance of the Convening Order, the JPLs launched solicitation of the Cayman Scheme to Scheme Creditors. On or about September 17, 2014, the JPLs caused the following solicitation materials (together, the "Scheme Solicitation Materials") to be made available to the Scheme Creditors:

>    i.     The Cayman Scheme, a copy of which is attached hereto as Exhibit B;
>
>    ii.    The Explanatory Statement (the functional equivalent of the disclosure statement required under section 1125 of the Bankruptcy Code), which provided an overview of LDK Parent, the terms of the Cayman Scheme, significant events in the Cayman

---

[13] Notices of each of the Scheme Class Meetings were in a form substantially similar to the forms of notice attached as appendices to the explanatory statement provided pursuant to Order 102, Rule 20(4)(e) of the Grand Court Rules and Section 166A of the Companies Ordinance relating to the Cayman Scheme and Hong Kong Scheme (the "Explanatory Statement"), a copy of which is attached hereto as Exhibit C.

Proceeding, and the times and date of the Scheme Class Meetings, among other information;

iii. The relevant voting packet (collectively, the "Voting Packets") to allow for Senior Note Scheme Creditors, Preferred Obligation Scheme Creditors, and Ordinary Scheme Creditors to vote on the Cayman Scheme; and

iv. Instructions and guidance for the Scheme Creditors to vote on the Cayman Scheme, including instructions on how to vote by proxy and the time and date of the Scheme Class Meetings.

(Sec. JPL Decl. ¶13.)

18.   The Scheme Solicitation Materials permitted the affected Scheme Creditors to indicate whether such creditor wished to nominate proxies to attend the Scheme Class Meeting or attend in person, and whether such creditor wished to vote to accept or reject the Cayman Scheme.  The deadline for such indications and nominations was October 15, 2014 (the "Voting Instruction Deadline").

## III.   Voting Results

19.   To become binding in accordance with its terms, a scheme of arrangement under Cayman law must be (a) approved by a majority in number representing 75% by value of each class of creditors or members present and voting at each of the applicable scheme meeting(s), and (b) sanctioned by order of the Cayman Court.[14]  (Sec. Manning Dec. ¶ 11).  If approved by the requisite majorities and sanctioned by the Court, the scheme becomes binding in accordance with its terms on the company and all of the creditors or members who are party to the scheme, even if they voted against it.  (Id.)

20.   In accordance with the Convening Order, the Scheme Class Meetings were held on October 16, 2014, commencing at 8:00 p.m. (Cayman Islands time) at the offices of

---

[14] Section 86(2) of the Cayman Companies Law.  Note that pursuant to section 86(3), the Court's order is of no effect until a copy of it has been delivered to the Cayman Islands Registrar of Companies for registration.  That is a purely administrative process.  (Sec. Manning Dec. ¶ 11)

Campbells at Floor 4, Willow House, Cricket Square, George Town, Grand Cayman KY1-11-3,

with a dial-in and video connection to Hong Kong at the offices of Sidley Austin LLP at 39/F,

Two International Finance Centre Central, Hong Kong.  The Scheme Class Meetings were

conducted in accordance with the instructions set forth in the Convening Order.  (Sec. JPL Decl.

¶ 18.)  One of the JPLs, Eleanor Fisher, acted as Chairperson of the Scheme Class Meetings in

respect of the Cayman Scheme and prepared a report of the Scheme Class Meetings in respect of

the Cayman Scheme (the "Chairperson's Report"), which the JPLs submitted to the Cayman

Court on October 27, 2014.[15]  (Id.)  At the conclusion of the meetings, each class of affected

Scheme Creditors voted overwhelmingly to approve the Cayman Scheme.  (Id.)

      21.     The voting results at the Scheme Class Meetings were as follows:

|  | By Value | By Number |
|---|---|---|
| Scheme Class Meeting for Preferred Obligation Scheme Creditors | 79% | 80% |
| Scheme Class Meeting for Senior Note Scheme Creditors | 99% | 97% |
| Scheme Class Meeting for Ordinary Creditors | 100% | 100% |

      22.     As indicated above, the Cayman Court has scheduled the Sanction

Hearing for November 6, 2014.  LDK Parent has been notified of one Preferred Obligation

Scheme Creditor, Apollo Asia Investment Limited ("Apollo"), who intends to appear at the

Sanction Hearing to oppose the sanctioning of the Cayman Scheme.  On October 24, 2014,

Apollo submitted its argument opposing the sanction of the Cayman Scheme to the Cayman

Court.  Apollo has principally argued that:

---

[15] A true and correct copy of the Chairperson's Report is attached as Exhibit C to the Second JPL Declaration.

i.   The Cayman Scheme documentation was inadequate in that it did not provide an adequate liquidation analysis and did not disclose material interests of directors who were being released under the Cayman Scheme;

ii.  The other Preferred Obligation Scheme Creditors in the class under the Cayman Scheme have special interests not aligned with the interests of their class;

iii. The Cayman Scheme contains releases that are beyond the jurisdiction of the Cayman Court; and

iv.  In light of the above issues, the Cayman Scheme is unfair and, accordingly, an intelligent and honest member of the class, acting in respect of their own interests, would not reasonably approve the Cayman Scheme.

23.    On October 31, 2014, the JPLs, on behalf of LDK Parent, submitted their arguments in favor of sanctioning the Cayman Scheme and their response to Apollo's objections. In their responsive argument to Apollo, the JPLs, on behalf of LDK Parent, argued that Apollo's objections had no merit, and that the Cayman Court should sanction the Cayman Scheme over the objections.   A copy of Apollo's arguments and evidence has been provided to the other Preferred Obligation Scheme Creditors who, notwithstanding Apollo's objection, have not raised any similar concerns.

## IV.    Implementation of the Cayman Scheme

24.    Upon entry of the Sanction Order and after this Court's consideration of the chapter 15 relief requested by the JPLs, the JPLs will commence implementation of the Cayman Scheme and, upon conclusion of the Cayman Scheme's implementation, the Cayman Scheme will be effective and binding upon all Scheme Creditors.[16]

---

[16] As stated above, following the Cayman Court's entry of the Sanction Order, the JPLs intend to file a copy of the Sanction Order with this Court, in support of this Motion, prior to the Recognition Hearing.

25.     The Cayman Scheme provides the steps necessary in order to implement the Cayman Scheme (the "Cayman Scheme Steps").  The steps are set forth in Clause 16 of the Cayman Scheme.  Among other things, the Cayman Scheme provides that, following entry of the Sanction Order, LDK Parent (acting by the JPLs) will work as expeditiously as possible to execute the necessary restructuring documents, provide the necessary instructions for distributions to creditors and ultimately make distributions to creditors as entitled under the Cayman Scheme, which distributions include the new securities, debt and cash to be provided to the Senior Note Scheme Creditors, Preferred Obligation Scheme Creditors and Ordinary Scheme Creditors.  (Sec. JPL Dec. ¶ 21.)  If one or more of the Cayman Scheme Steps does not occur, then all other Cayman Scheme Steps shall be deemed not to occur or have occurred, any actions taken pursuant to such Cayman Scheme Steps will have no legal effect, and the releases given or to be given under the Cayman Scheme or in any deed of release under the Cayman Scheme will be deemed not given or not to have been given.  (Id.)  To the extent possible, the Cayman Scheme Steps will occur in the sequential order set out in Clause 16.

26.     In addition, Clause 38 of the Cayman Scheme contains certain conditions to be satisfied prior to the effective date of the Cayman Scheme (the "Scheme Effective Date") in order for the provisions of the Cayman Scheme to become effective.  These conditions include, among others, this Court entering an order, upon recognition of the Cayman Scheme as a foreign main proceeding, granting recognition of and giving effect to certain aspects of the compromise and arrangement set forth in the Cayman Scheme, which condition may be waived by the JPLs, on behalf of LDK Parent, with the prior written consent of the trustee for the Senior Notes and the "Majority Preferred Holders," (which the Cayman Scheme defines as the holders of at least two-thirds of the Preferred Obligations).  (Sec. JPL Decl. ¶ 22.)

## **RELIEF REQUESTED**

27.     By this Motion, the Foreign Representatives request entry of the

Enforcement Order, substantially in the form attached hereto as <u>Exhibit A</u>, pursuant to sections

105(a), 1507(a) and 1521(a) of the Bankruptcy Code that:

i.    provides that, as of the Scheme Effective Date, the Sanction Order and the Cayman Scheme are recognized, granted comity, entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and that such terms shall be binding and fully enforceable on the Scheme Creditors, as well as their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any persons claiming through or in the right of any such persons or entities (collectively, the "<u>Related Parties</u>") whether or not they actually agreed to be bound by the Cayman Scheme or participated in the Cayman Proceeding;

ii.    provides that, as of the Scheme Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of any entity released pursuant to the Deeds of Release[17] (which includes LDK Parent or the Senior Note Guarantors or Preferred Obligors) with respect to any debt cancelled, discharged or restructured under the Cayman Scheme and/or as a result of Cayman law relating to the Cayman Scheme, is unenforceable; <u>provided</u>, <u>however</u>, that if such debt is restructured under the Cayman Scheme or such law, the enforceability of such judgment is impaired by any order entered in respect of this Chapter 15 Case only to the extent it is inconsistent with the Cayman Scheme and such law;

iii.    as of the Scheme Effective Date, permanently enjoins all Scheme Creditors and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act to collect, recover or offset (except as expressly provided in the Cayman Scheme) any debt cancelled, discharged or restructured under the Cayman Scheme and/or as a result of Cayman law relating to the Cayman Scheme, or seeking any discovery related thereto; <u>provided</u>, <u>however</u>, that if such debt is restructured under the Cayman Scheme

---

[17] The Cayman Scheme and Explanatory Statement defines the "<u>Deeds of Release</u>" as "the forms of deeds of release between [LDK Parent], LDK Silicon, LDK Silicon Holding, the Senior Note Guarantors and the Scheme Creditors as set out in Schedule 4 to be governed, respectively, by the laws of the Cayman Islands, the State of New York, and the Hong Kong Special Administrative Region."

and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Cayman Scheme and/or such law;

iv. as of the Scheme Effective Date, permanently enjoins all Scheme Creditors and Related Parties from commencing or continuing any action (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action or proceeding or process whatever in any judicial, arbitral, administrative or other forum), including by way of counterclaim, employing any process, or performing any act, to collect, recover or offset (except as expressly provided in the Cayman Scheme) any debt cancelled, discharged or restructured under the Cayman Scheme and/or as a result of Cayman law relating to the Cayman Scheme, against property of any entity released pursuant to the Deeds of Release within the territorial jurisdiction of the United States, including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial or administrative judgment, award, determination, decree, assessment, garnishment or order, against any entity released pursuant to the Deeds of Release or their respective property, or any direct or indirect transferee of or successor to any property of any entity released pursuant to the Deeds of Release, or any property of such transferee or successor, or (ii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property; provided, however, that if such debt is restructured under the Cayman Scheme and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Cayman Scheme and/or such law;

v. as of the Scheme Effective Date, permanently enjoins Scheme Creditors and Related Parties from (i) transferring, relinquishing or disposing of any property of any entity released pursuant to the Deeds of Release located within the territorial jurisdiction of the United States, or (ii) taking or continuing any act to obtain possession of, comingle, or exercise control over, such property, to the extent any such act under (i) or (ii) is inconsistent with the Cayman Scheme and Cayman law relating to the Cayman Scheme;

vi. permanently enjoins the commencement of any suit, action or proceeding in the territorial jurisdiction of the United States to settle any dispute which arises out of any provision of the Cayman Scheme and Cayman law relating to the Cayman Scheme;

vii. as of the Scheme Effective Date, permanently enjoins all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the United States Bankruptcy Court's jurisdiction from taking any action inconsistent with the Cayman Scheme, including, without limitation, against any entity

01:16266978.1

released pursuant to the Deeds of Release or against any property of any entity released pursuant to the Deeds of Release within the territorial jurisdiction of the United States;

viii.    as of the Scheme Effective Date, permanently enjoins Scheme Creditors and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), or employing any process, against the Foreign Representatives (personally or in such capacity), or any entity released pursuant to the Deeds of Release, or any of their respective successors, assigns, agents, representatives, advisors or attorneys (collectively, the "LDK Parties") or any of them in respect of any claim or cause of action, in law or in equity, arising out of or relating to any action taken or omitted to be taken by any of the LDK Parties as of the Scheme Effective Date in connection with this Chapter 15 Case or in preparing, disseminating, applying for or implementing the Cayman Scheme or the Scheme Sanction Order provided, however, that the relief granted shall be no broader than, and shall be consistent with, the relief provided to the LDK Parties in the Cayman Scheme including, but not limited to, the relief set forth in Clause 41 of the Cayman Scheme;

ix.    provides that no action taken by the Foreign Representatives in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Cayman Scheme, or any order entered in respect of the Chapter 15 Case, any further order for additional relief in the Chapter 15 Case, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the JPLs as Foreign Representatives, including without limitation pursuant to section 1510 of the Bankruptcy Code;

x.    provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of such order; and

xi.    provides such other and further relief as the Court deems proper and just.

Cross-border coordination is necessary for the successful completion of the global restructuring of LDK Parent and its large number of intermediate offshore holding and operating companies (collectively, the "Group").  Moreover, recognition of the Sanction Order and the Cayman Scheme is essential to a fair and efficient enforcement of the terms of the Cayman Scheme.

01:16266978.1

Recognition and enforcement are consistent with the goals of international cooperation and

assistance to foreign courts underpinning chapter 15 of the Bankruptcy Code.

## BASIS FOR RELIEF REQUESTED

**I.   The Relief Requested is Consistent with Section 1521 of the Bankruptcy Code**

  *A. The Relief Requested is Necessary to Effectuate the Purposes of Chapter 15 and to Protect the Assets of LDK Parent and Interests of its Creditors in the United States*

   28. Section 1521 of the Bankruptcy Code authorizes the court, upon

recognition of a foreign proceeding, to grant "any appropriate relief" at the request of the foreign

representative "where necessary to effectuate the purpose [of Chapter 15] and to protect the

assets of the debtor or the interests of creditors." 11 U.S.C. § 1521(a). Such relief may include:

  (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

  (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

  (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

  . . . .

  (5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

  . . . .

  (7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

Id.

   29. Granting recognition and enforcing the Cayman Scheme and Sanction

Order is appropriate and necessary to effectuate the purpose of Chapter 15 and protect the assets of the Company and interests of the Scheme Creditors.  Recognition and enforcement of the Cayman Scheme and Sanction Order will give full effect and credit to the relief granted by the Cayman Court, a competent foreign court exercising proper jurisdiction.  Fair and efficient administration of LDK Parent's global restructuring that protects all parties in interest requires that all Scheme Creditors be bound by the terms of the Cayman Scheme as made effective by the Cayman Court.  In order to effectuate a successful restructuring and equitably distribute LDK Parent's assets to Scheme Creditors in an orderly fashion pursuant to the Cayman Scheme, it is imperative that the authority of the Cayman Court is recognized by this Court in accordance with the principles of comity.  Granting the Enforcement Order will promote greater legal certainty for LDK Parent as it exits its global restructuring and emerges as a more competitive company with a sustainable debt structure.  In cases like the present, where the interests of creditors are "sufficiently protected," relief under Section 1521 may be granted.  11 U.S.C. 1522(a).

      **B.**      ***Granting the Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected"***

      30.      Granting recognition and enforcing the Cayman Scheme and Sanction Order will leave LDK Parent's creditors and other parties in interest "sufficiently protected." While the Bankruptcy Code does not explicitly define "sufficiently protected" in section 1522(a), the legislative history indicated that the language was meant to apply "if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors."  House Rep. No. 109-t 1, 109th Cong., 1st Sess. 11 (2005).  As a result, courts have focused on the procedural fairness of the foreign proceeding in order to determine whether creditors are sufficiently protected.  See, e.g. In re Metcalfe & Mansfield Alternative Investments, 421 B.R. 685, 697 (Bankr. S.D.N.Y. 2010) (in determining whether to grant full force and effect to a foreign

proceeding, court examined whether the procedures utilized in the foreign proceeding were in accordance with the American notions of fundamental fairness).

31.     As set forth in the Second JPL Declaration, Scheme Creditors were afforded maximum due process and the ability to participate in the Cayman Proceeding similar to the level of participation available to creditors in a chapter 11 proceeding.  Scheme Creditors were able to participate at the Convening Hearing and Scheme Class Meetings, and will have the opportunity to participate at the Sanction Hearing.  (See Sec. JPL Decl. ¶ 8, 18). Furthermore, the Cayman Scheme was made publicly available well in advance of the Scheme Class Meetings to all interested parties via the Scheme Petition on August 29, 2014.  Since that time, all Scheme Creditors have been able to obtain a copy of the Cayman Scheme through the Scheme Website.

### C.     The Discretionary Relief Requested Meets the Standards for Injunctive Relief

32.     Pursuant to section 1521(e), the standards for injunctive relief apply to certain relief requested under section 1521.  11 U.S.C. § 1521(e).  With respect to the relief requested herein, the Foreign Representatives believe those standards are satisfied.   In the Third Circuit, granting injunctive relief is subject to a four-point inquiry evaluating " (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest." United States v Bell, 414 F.3d 474, 478 n.4 (3d Cir. 2005) (citing ACLU of N.J. v. Black Horse Pike Reg'l Bd. Of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc)).  Courts in this District, acknowledging the importance of recognizing the authority of a foreign court in a restructuring, have routinely issued injunctive relief in furtherance of granting recognition to restructuring plans, schemes, sale orders and other orders following

recognition in a chapter 15 case pursuant to sections 1521 and 1507 of the Bankruptcy Code.[18]

33.     In accordance with injunctive relief standards, courts have found irreparable harm to an estate exists when the orderly determination of claims and fair distribution of assets is threatened or disrupted.  See In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors."); In re Garcia Avila, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) ("irreparable harm is present when the failure to enjoin local actions will disrupt the orderly reconciliation of claims and fair distribution of assets in a single, centralized forum."); Banco Nacional de Obras y Servicios Publico S.N.C., 91 B.R. 661, 664 (Bankr. S.D.N.Y. 1988) (injunctive relief necessary to "prevent individual American creditors from arrogating to themselves property belonging to the creditors as a group.").

34.     Entry of the Enforcement Order and enforcing the terms of the Cayman Scheme, including the releases granted by the holders of the Senior Notes and Preferred Obligations, will protect Scheme Creditors from suffering irreparable harm by prohibiting dissident or minority creditors from seeking to commence actions in the United States and execute upon any of LDK Parent's assets located in the United States.  The requested relief is necessary to protect the interests of the Scheme Creditors in this global restructuring and prevent

---

[18] See, e.g., In re Elpida Memory, Inc., No. 12-10947 (CSS) [Docket No. 446] (Bankr. D. Del. Jun. 25, 2013) (granting recognition of Japanese reorganization plan and related confirmation orders and granting permanent injunction pursuant to §§ 105(a), 1517 and 1521); In re Hellas Telecommns. (Luxembourg) V., No. 10-13651 (KJC) [Docket No. 38] (Bankr. D. Del. Dec. 13, 2010) (granting recognition of foreign main proceeding and  recognizing and granting comity to scheme and restructuring documents approved in UK insolvency proceedings pursuant to §§ 105(a), 1507 and 1521);  In re Electro Sonic Inc., No. 14-10240 (PJW) [Docket No. 47] (Bankr. D. Del. Mar. 24, 2014) (recognizing Canadian sale/vesting order pursuant to §§ 105(a) and 1521); In re Grant Forest Prods., Inc., No. 10-11132 (PJW) [Docket No. 57] (Bankr. D. Del. Apr. 26, 2010) (affirming and enforcing order of Canadian Court approving sale of certain assets pursuant to §§ 105(a), 1507 and 1521); In re Skypower Corp., No. 09-12914 (PJW) [Docket No. 48] (Bankr. D. Del. Jan. 19, 2010) (recognizing and enforcing sale order of Ontario Superior Court of Justice approving the sale of certain assets and interim distribution on claims pursuant to §§ 105(a), 1507 and 1521); In re Catalyst Paper Corp., No. 12-10221 (PJW) [Docket No. 99] (Bankr. D. Del. Mar. 27, 2012) (enforcing Canadian court order in connection with sale pursuant to §§ 105(a) and 1521).

01:16266978.1

individual creditors from frustrating the purpose of the Cayman Scheme, which is the fair and

efficient administration of LDK Parent's global restructuring in order to maximize value for all

creditors.  The JPLs fear that, in the absence of the relief requested, the administration of the

Cayman Scheme, and ultimately the success of LDK Parent's global restructuring, will be

irreparably damaged by Scheme Creditors attempting to circumvent the *pro rata* distribution of

consideration under the Cayman Scheme by commencing actions in the United States to the

detriment of the Scheme Creditors and LDK Parent's ability to reemerge as a competitive

operating business.[19] (See Sec. JPL Dec. ¶ 21).

35.     Furthermore, granting the requested relief and enforcing the terms of the

Cayman Scheme, including the releases granted by the holders of the Senior Notes and Preferred

Obligations, would promote the "fair and efficient administration of cross-border insolvencies

that protect the interests of *all* creditors, and interested parties, including the debtor" by ensuring

that the implementation of the Cayman Scheme would not be placed in jeopardy due to any delay

resulting from collateral actions in the United States.  See 11 U.S.C. § 1501(a)(3) (emphasis

added).

36.     In addition, the three remaining factors in the injunctive relief analysis are

easily met.  First, the Foreign Representatives have successfully illustrated that creditors'

interests are sufficiently protected in the Cayman Proceedings.  In re Innua Can., Ltd., No. 09-

16362, 2009 Bankr. LEXIS 994, at *9 (Bankr. D.N.J. Mar. 25, 2009) (finding a likelihood of

success on the merits had been shown and was necessary in order to grant relief under chapter 15

of the Bankruptcy Code).  As discussed above Section I.B. above, Scheme Creditors were and

will be afforded maximum due process and the ability to participate in the Cayman Proceeding

---

[19] LDK Parent's assets in the United States include, without limitation, its equity interests in its United States
subsidiaries and affiliates, including the Chapter 11 Debtors.

01:16266978.1

similar to the level of participation available to creditors in a chapter 11 proceeding, and have

had ample notice and opportunity to review and object to the Cayman Scheme.

37.     Second, there will be no greater harm to any third parties as all classes of

Scheme Creditors have voted overwhelmingly to accept the Cayman Scheme and, therefore,

granting the related relief will simply maintain the status quo by ensuring that the terms of the

Cayman Scheme and LDK Parent's global restructuring are protected and LDK Parent remains

on track to emerge from its restructuring as soon as possible.  See, e.g., Kos Pharm., Inc. v.

Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004) ("One of the goals of the preliminary injunction

analysis is to maintain the status quo.").

38.     Finally, granting recognition of a foreign court's order when such order is

within the jurisdiction of the court is consistent with the principles of comity and the objectives

of Chapter 15.  Granting injunctive relief is necessary to, among other things, promote

cooperation between the courts of the United States and the Cayman Islands while providing

greater legal certainty to the Scheme Creditors by preventing disruption that could arise from

collateral attacks in the United States.  See 11 U.S.C. §§ 1501(a)(1), (a)(2), (a)(3); CT

Investment Mgmt. Co., LLC v. Cozumel Caribe, S.A. de C.V., 482 B.R. 96, 118 (Bankr.

S.D.N.Y. 2012) (granting stay of collateral lawsuits pursuant to sections 1521).

39.     Thus, in this case, strong grounds exist to grant the requested relief under

sections 1521 and 1507, including the release of the non-debtor guarantors of the Senior Notes

and Preferred Obligations.  The Cayman Scheme, including the releases under the Cayman

Scheme, is consistent with applicable Cayman law, and thus the entirety of the Cayman Scheme

should be recognized and afforded comity in the United States.  In re Metcalfe, 421 B.R. at 694-

95 (Bankr. S.D.N.Y. 2010) (noting that the correct inquiry in enforcing a foreign scheme is not

whether the scheme could be approved in a chapter 11 case, but rather "whether the foreign orders should be enforced in the United States" under the principles of comity). Cayman law permits the release of non-debtor guarantors of debt to be compromised under a scheme of arrangement "provided that there is a reasonable element of 'accommodation' or 'give and take' as between the scheme participants which redounds in such manner as to involve an element of accommodation or give and take on the part of the third party as well." (Sec. Manning Dec. ¶ 42-48) (quoting Re Sphinx Group of Companies [2010 (1) CILR 452], page 463 at [31]). Cayman law has recognized the ability of a scheme of arrangement between a debtor and its creditors to release third party claims through a scheme, and that such releases are within the jurisdiction of the Cayman Court. Id.. The Foreign Representatives submit that this standard is satisfied in this case as will be demonstrated to the Cayman Court. See Sec. Manning Dec. ¶ 48.

40.     Indeed, the aforementioned releases are essential to the success of the Cayman Scheme and LDK Parent's global restructuring. As noted in the First JPL Declaration, LDK Parent is primarily a holding company for its direct and indirect interests in its operating company subsidiaries. If these operating company subsidiaries were called upon to satisfy the Senior Note Guarantee Claims, for example, they would in turn assert reimbursement and/or subrogation claims against LDK Parent thereby depleting LDK Parent's assets to the same extent as the Senior Notes claims themselves.  More importantly, commencing insolvency proceedings with respect to each of the guarantor entities in no less than six (6) jurisdictions may have resulted in value destruction to the detriment of the Group as these jurisdictions have different insolvency regimes that may have required liquidation of such entities' assets to the detriment of all stakeholders.[20]

---

[20] As the Court and parties in interest are well aware, the Chapter 11 Debtors proposed the prepackaged plan of reorganization in order to, among other things, provide an orderly process for releasing the Chapter 11 Debtors'

01:16266978.1

41.     Other courts have recognized that chapter 15 provides for a "broad range of relief" and have issued injunctive relief in circumstances where a foreign scheme of arrangement provided for the release of third parties, including third party guarantors such as the case here.  See, e.g., In re Magyar Telecom B.V., No. 13-13508 (SHL) [Docket No. 26] (Bankr. S.D.N.Y. Dec. 11, 2013); In re Zlomrex Int'l Financing S.A., No. 13-14138 (SHL) [Docket No. 17] (Bankr. S.D.N.Y.  Jan. 31, 2014); In re Metcalfe, 421 B.R. 685 (recognizing and enforcing a Canadian plan and granting permanent injunctive relief where the plan included third party releases); In re Ho Seok Lee, 348 B.R. 799, 803 (Bankr. W.D. Wash. 2006) (granting permanent injunction in favor of Korean plan of reorganization pursuant to section 1521(a)."); Garcia Avila, 296 B.R. at 115 (granting injunctive relief protecting the debtor's assets in the United States used to fund a proposed foreign plan); In re Sino-Forest Corp., 501 B.R. 665 (Bankr. S.D.N.Y. 2013) (recognizing, enforcing and granting permanent injunctive relief in chapter 15 case in respect of foreign plan that included protection for third party releases in Canadian plan).[21]

42.     As noted above, the Sanction Hearing is scheduled to occur on November 6—prior to the date this Court is scheduled to consider the Enforcement Order.  At the Sanction Hearing, the Foreign Representatives expect that the Cayman Court will sanction the Cayman

---

guarantee liability for the Senior Notes in exchange for the distributions provided under the Cayman Scheme.  Each of the Chapter 11 Debtors are U.S. entities, which own valuable off-shore assets, and the guarantees provided to the Senior Noteholders are governed by New York law.  Consequently, the Chapter 11 Debtors felt the prepackaged plan of reorganization was necessary component of the Group's global restructuring.

[21] Although one circuit court of appeals has refused to grant comity to a Mexican plan of reorganization providing for a non-consensual third party release, such case is wholly distinguishable and non-binding on this Court.  Ad Hoc Group of Vitro Noteholders v. Vitro SAB De CV (In re Vitro SAB De CV), 701 F.3d 1031 (5th Cir. 2012).  Not only does the Fifth Circuit, unlike the Third Circuit, universally prohibit non-consensual, non-debtor releases under any circumstances, but the plan and process at issue were significantly different from the Cayman Scheme, Cayman Islands law applicable to such issues and the extensive due process afforded to creditors.  Id. at 159. Rather, the circumstances in this case more closely align with the recent decision of the Bankruptcy Court for the Southern District of New York in In re Sino-Forest Corp., 501 B.R. 655, which rejected the reasoning in Vitro and approved non-consensual, third-party releases based on the fact that the plan had issue had near unanimous support, that support did not rely on votes by insiders, and the foreign court's decision to approve the non-consensual, third-party releases "reflected similar sensitivity to the circumstances justifying approving such provisions" as those typically considered by U.S. courts.  Id. at 665.

Scheme, including the aforementioned third party releases, and shall report the results of the

Sanction Hearing to this Court.

## II.      The Requested Relief Meets the Requirements of Section 1507 of the Bankruptcy Code

43.      As noted above, section 1507 of the Bankruptcy Code also supports the

relief requested herein.  Upon recognition of a foreign proceeding, section 1507 of the

Bankruptcy Code authorizes a court to "provide additional assistance to a foreign

representative." 11 U.S.C. § 1507(a).  Bankruptcy Code section 1507 further provides:

> (b) In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure –
>
> (1)    just treatment of all holders of claims against or interests in the debtor's property;
>
> (2)    protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;
>
> (3)    prevention of preferential or fraudulent dispositions of property of the debtor;
>
> (4)    distribution of proceeds of the debtor's property substantially in accordance with the order prescribed [in the Bankruptcy Code]; and
>
> (5)    if appropriate, the provision of an opportunity for a fresh start for the individual that [the] foreign proceeding concerns.

11 U.S.C. § 1507(b).

44.      The plain language of section 1507(b) is clear that the principles of comity

are an integral factor in a court's analysis of whether to grant additional assistance under section

1507.  See 11 U.S.C. § 1507; see also In re Elpida Memory, Inc., No. 12-10947, 2012 Bankr.

LEXIS 5367, at *11 (Bankr. D. Del. Nov. 16, 2012) ("there is no doubt that the relief

available…and particularly additional assistance granted pursuant to section 1507 should be consistent with the principle of comity"); In re Metcalfe, 421 B.R. at 696 ("Section 1507 directs the court to consider comity in granting additional assistance to the foreign representative"). Once a case has been recognized as a foreign proceeding, chapter 15 contemplates that the court will exercise its discretion in granting additional relief consistent with the principles of comity. See In re Atlas Shipping, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009) (relief post-recognition is 'largely discretionary and turns on subjective factors that embody principles of comity.") (quoting In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd., 389 B.R. 325, 333 (S.D.N.Y. 2008); see also In re Rede Energia S.A., 515 B.R. 69, 91 (Bankr. S.D.N.Y. 2014) (same); see also 11 U.S.C. § 1509(b)(3) (once recognition of a foreign proceeding is granted, a "court in the United States shall grant comity or cooperation to the foreign representative.").

45.     In general, the Court may enforce a judgment rendered by a foreign court exercising proper jurisdiction under principles of comity where the enforcement would unfairly prejudice the rights of United States citizens or violate domestic policy.  See Somportex Ltd. v. Phil. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1972);  In re Sino-Forest Corp., 501 B.R. 655, 662 (Bankr. S.D.N.Y. 2013).  In such case, the foreign court's "judgment is prima facie evidence…of the truth of the matter adjudged; and…should be held conclusive upon the merits tried in the foreign court, unless some special ground is shown for impeaching the judgment, as by showing that it was affected by fraud or prejudice, or that the principles of international law, and by the comity of our own country, it should not be given full credit and effect."  In re Aerovias Nacionales De Colom. S.A. 345 B.R. 120, 126 (Bankr .S.D.N.Y. 2006) (quoting Hilton v. Guyot, 159 U.S. 113, 159-160 (1895); In re Elpida, 2012 Bankr. LEXIS 5367, at *24

("Granting comity to the judgments in foreign bankruptcy proceedings is appropriate as long as U.S. parties are provided the same fundamental protections that litigants in the United States would receive."); In re Metcalfe, 421 B.R. at 698 ("[W]hen the foreign proceeding is in a sister common law jurisdiction with procedures akin to our own, comity should be extended with less hesitation, there being fewer concerns over the procedural safeguards employed in those foreign proceedings.") (citing Hilton v. Guyot, 159 U.S. at 202-203). The principles of comity are "particularly appropriately applied" in bankruptcy cases because of the unique challenges posed by cross-border restructurings and because of the specific discussion of comity within chapter 15. Stonington Partners v. Lernout & Hauspie Speech Prods. N.V., 310 F.3d 118, 126 (3d Cir. 2002). As a result, courts routinely extend comity to enforce foreign judgments arising from foreign insolvency proceedings. See, e.g., Victrix S.S Co. S.A. v. Salen Dry Cargo A.B., 825 F.2d 709, 713 (2d Cir. 1987) ("American courts have long recognized the particular need to extend comity to foreign bankruptcy proceedings.").

46.     Consistent with these principles, it is clear that the well-settled principles of comity support recognition and enforcement of the Cayman Scheme and Sanction Order. United States courts have previously found that Cayman Islands insolvency proceedings meet the standards of international comity. See, e.g.; In re Soundview Elite, Ltd., 503 B.R., 571, 592 (Bankr. S.D.N.Y. 2014) ("It's my desire, as a U.S. bankruptcy judge, to render comity to Cayman needs and concerns to the extent I can, and I'm confident that the Cayman Court, now that it knows my needs and concerns, would do the same for me. That's especially so since we share common goals—maximizing value for stakeholders in the cases on our watch; ensuring the faithful performance of corporate responsibilities in those cases (and appointing independent fiduciaries when necessary); and, to the extent applicable, recognizing regulatory needs and

concerns."). Moreover, as described above and in the Chairperson's Report, the Scheme

Creditors voted overwhelmingly to accept the Cayman Scheme after a solicitation process that

was largely consistent with the principles underlying solicitation of plans of reorganization under

the Bankruptcy Code. This solicitation followed a prolonged arm's-length negotiation process

whereby, ultimately holders of approximately 60% in value of the Senior Notes (the "Consenting

Noteholders"), and (ii) holders representing 80% in number and 79.2% in value of the Preferred

Obligations (the "Consenting Preferred Holders") signed onto restructuring support agreements

(collectively, the "RSAs") that serve as the core of the Cayman Scheme.

      47.    As described above, the Cayman Scheme was filed with the Cayman

Court on August 29, 2014, forty-seven (47) days prior to the Voting Instruction Deadline. In

addition, Scheme Creditors were provided with the Scheme Solicitation Materials on September

17, 2014, twenty-eight (28) days from the Voting Instruction Deadline. (Sec. JPL Decl. ¶ 13).

The Scheme Creditors had full access to all Scheme Solicitation Materials at all times through

the Scheme Website. Scheme Creditors were afforded the opportunity to attend and object at the

Convening Hearing and Scheme Class Meetings, and will also have the opportunity to object at

the Sanction Hearing. (See Sec. JPL Decl. ¶ 9, 18). In order to ensure the success of the

Cayman Scheme and LDK Parent's global restructuring, recognition and enforcement of the

Sanction Order in the United States is fully within the principles of comity. Canada S.Ry. Co. v.

Gebhard, 109 U.S. 527, 539 (1883) ("[u]nless all parties in interest, wherever they reside, can be

bound by the arrangement which it is sought to have legalized, the scheme may fail. All home

creditors can be bound. What is needed is to bind those who are abroad. Under these

circumstances the true spirit of international comity requires that schemes of this character,

legalized at home, should be recognized in other countries.").

01:16266978.1

**III.     The Requested Relief Meets Each of the Factors Set Forth Under Section 1507(b) of the Bankruptcy Code**

*D.     The Requested Relief Assures Just Treatment of Creditors (§1507(b)(1))*

48.     Recognition and enforcement of the Sanction Order is appropriate in this case because it will assure "just treatment of all holders of claims against or interest in the debtor's property."  11 U.S.C. § 1507(b)(1).  This factor is typically satisfied upon a showing that the applicable law "provides for a comprehensive procedure for the orderly and equitable distribution of [the debtor]'s assets among all of its creditors." In re Rede Energia, 515 B.R. at 95.  Instances where a foreign proceeding may not satisfy this factor include where the proceeding fails to provide certain creditors with access to adequate information or an opportunity to be heard (*i.e.* a fundamental denial of due process).  Id.  As stated in the Second Manning Declaration, the scheme procedure under Cayman Islands law ensures that each creditor will receive access to adequate information and an opportunity to be heard.  For example, prior to a convening hearing (*i.e.* the Convening Hearing), the applicant is required to consider giving notice to persons affected by the scheme if there were issues that would lead the Court to refuse to sanction the scheme.  (Sec. Manning Decl. ¶ 13).  Similarly, at a convening hearing, the applicant must satisfy the Cayman Court that the proposed scheme documentation, including forms of proxy and an explanatory statement, will provide creditors with all information reasonably necessary to make an informed decision on the proposed scheme.  (Id. at ¶ 21).  And within seven business days following the date of creditor meetings (*i.e.,* the Scheme Class Meetings), the applicant must file a sworn affidavit verifying that notices were sent and the meetings were held in accordance with the Cayman Court's directions.  (Id. at ¶ 26).

49.     In this case, all creditors of LDK Parent had the opportunity to be heard at all times during the Cayman Proceedings, including prior to the Convening Hearing, Scheme

Class Meetings, and the Sanction Hearing.  Creditors were provided with the Practice Statement

Letter approximately one (1) week prior to the Convening Hearing through email, the Scheme

Website, and notification through the Clearing Systems.  (Sec. JPL Decl. ¶ 8).  Similarly,

Scheme Creditors received notice of the Convening Hearings and the Scheme Solicitation

Materials twenty-eight (28) days from the date of the Scheme Class Meetings via the same

methods, and were publicly notified of the Scheme Class Meetings via publication in widely

circulated news publications.  (Sec. JPL Decl. ¶ 12-13).  Scheme Creditors were invited to attend

both the Convening Hearing and Scheme Class Meetings, and are also invited to attend the

Sanction Hearing.  Furthermore, Scheme Creditors were provided with access at all times to

relevant materials, including the Cayman Scheme, at the Scheme Website. (Sec. JPL Dec. ¶ 12).

The Cayman Proceeding has been a fair, efficient, and just process where creditors could assert

and prosecute claims against LDK Parent.

         50.     The Cayman Scheme provides for a significant recovery for the Scheme

Creditors, which includes a cash or equity and debt security component.  The requested relief is

necessary to effect LDK Parents' restructuring and the administration of the Cayman Scheme's

orderly and equitable distribution of LDK Parent's assets.  (Sec. JPL Decl. ¶ 22).  The cross-

border nature of the restructuring, which includes both the Plan and Cayman Scheme, has been

implemented in order to prevent certain creditors from seeking to obtain judgments in foreign

jurisdictions, including the United States, against LDK Parent and the Senior Note Guarantors

(among others), in order to obtain more than the *pro rata* treatment to which they are entitled

pursuant to the terms of the Cayman Scheme. If such creditors can effectively evade the terms of

the Cayman Scheme by commencing actions in the United States, LDK Parent or other members

of the LDK Group would be required to defend any such proceedings, resulting in the depletion

01:16266978.1

of valuable resources and prejudicing reorganized value. Therefore, the relief requested is an

essential step in preventing individual creditors from frustrating the purposes of the Cayman

Scheme, the foremost of which is the fair and efficient administration of LDK Parent's

restructuring in order to maximize value for all creditors.

  **E.**  ***There is No Prejudice or Inconvenience to U.S. Creditors in the Processing of Claims (§1507(b)(2))***

  51.  Section 1507(b)(2) is satisfied because LDK Parent's U.S. creditors will

be protected against prejudice and inconvenience in the processing of claims in the Cayman

Proceeding.  As stated in the Second Manning Declaration, a scheme which would treat scheme

creditors in a prejudicial manner based on their geographical location would give rise to a clear

basis on which to oppose sanction of such scheme on fairness grounds.  (Sec. Manning Decl. ¶

36).  Furthermore, any person with a substantial economic interest may be heard at a sanction

hearing, and the Cayman Court may order that the creditor meetings (*i.e.* the Scheme Class

Meetings) be held outside of the Cayman Islands or, as in the case of the Scheme Class

Meetings, with a video-link to a venue that is accommodating to creditors  (Id. at ¶ 23, 29).

  52.  In addition, schemes such as the Cayman Scheme contain procedures and

mechanisms for the adjudication and determination of claims.  (Sec. Manning Decl. ¶ 35).  These

mechanisms vary, but typically include a right of appeal or challenge to a court or other

independent tribunal from the decision of the person or body adjudicating the scheme claim.

(Id.).  Under the Cayman Scheme, for example, the claims of the Ordinary Scheme Creditors will

be adjudicated by scheme supervisors (which will be the JPLs, unless they resign or are

removed).  (Id.)  If an Ordinary Scheme Creditor disagrees with the scheme supervisors'

adjudication of its claim it will have the right to challenge their decision in the Court.  (Id.).[22]

---

[22] As stated in the Second Manning Declaration, because of the overwhelming acceptance of the Senior Note

53.     Moreover, all Scheme Creditors were afforded a sufficient amount of time to consider, and ultimately vote in favor of, the terms of the Cayman Scheme, which was originally filed with the Cayman Court on August 29, 2014.  Notice of intention to convene the Scheme Class Meetings was delivered to all holders on September 17, 2014 via (i) the Scheme Website, (ii) a corporate action notification through the relevant Clearing Systems, (iii) electronic email to each person that LDK Parent believed may be a Scheme Creditor, and (iv) publication in the *Cayman Compass* on September 23, 2014, and the *South China Morning Post* and the *Wall Street Journal* (including the International Edition) on September 24, 2014.  (JPL Decl. ¶ 12)  From September 17, 2014 through the convening of the Scheme Class Meetings, the JPLs answered all inquiries from creditors related to the Cayman Scheme and kept the website containing all relevant materials open and available.  All Scheme Creditors were invited to attend the Scheme Class Meetings and vote on the Cayman Scheme.  (<u>See</u> Sec. JPL Decl. ¶ 18).  In addition, certain key stakeholders, including the Consenting Noteholders and Consenting Preferred Holders, received an opportunity to review and comment on the Cayman Scheme prior to its dissemination.  All creditors will have another opportunity to raise objections to the Cayman Scheme and to submit and examine evidence at the Sanction Hearing.

### F.     The Requested Relief Assures Prevention of Preferential or Fraudulent Disposition of LDK Parent's Property (§1507(b)(3))

54.     Section 1507(b)(3) analyzes whether applicable foreign insolvency law affords creditors means for preventing preferential or fraudulent disposition of the debtor's property.  That factor is easily satisfied here.  Throughout a Cayman proceeding, a debtor is subject to significant oversight, particularly upon the appointment of a provisional liquidator.

---

Scheme Creditors and Preferred Obligation Scheme Creditors, such claims will not be subject to an adjudication process.  (Sec. Manning Dec. ¶ 35).

The provisional liquidator is an officer of the Cayman Court and acts as an agent of the Company.  (First Manning Decl. ¶ 26.)  Moreover, the provisional liquidator occupies a fiduciary position with respect to the company's assets and the stakeholders in the proceeding.  (Id.)  Similar to a chapter 11 proceeding, in the case of an insolvent company such as that of LDK Parent, the provisional liquidator's fiduciary duties are equated to the interests of the creditors, and the provisional liquidators are required to consider the interests of creditors as a whole when discharging their fiduciary duties.  (Id.).

55.    In addition, the Cayman Court may also order the provisional liquidator to appoint a liquidation committee, which the Cayman Court did in the Cayman Order.  (First Manning Decl. ¶ 27).  The members of the liquidation committee also serve in a representative and fiduciary capacity on behalf of all creditors.  (Id.).  The provisional liquidator is required to provide notice to the liquidation committee when applying to the court to exercise its powers, and the liquidation committee must also be consulted for their views on the provisional liquidator's remuneration before Cayman Court approval of that remuneration is sought.  (Id.).

G.    **The Requested Relief Assures Distribution of LDK Parent's Property Substantially in Accordance with the Bankruptcy Code (§1507(b)(4))**

56.    Section 1507(b)(4) analyzes whether the foreign bankruptcy law substantially complies with the priorities under the Bankruptcy Code.  To satisfy this factor, the foreign priorities scheme does not have to wholly replicate what is provided by the Bankruptcy Code.  See, e.g., In re Rede Energia S.A., 515 B.R. at 97 (finding that Brazilian plan of reorganization satisfied section 1507(b)(4) where proceeds were being distributed "substantially" in accordance with U.S. law).  Rather, the priority scheme must only be similar to the Bankruptcy Code's distribution scheme and have a reasonable basis.  Id.

57.     Under relevant Cayman law, the Cayman Court will consider three

overriding factors in determining whether to sanction a scheme:

    i.     The Court's directions and the applicable statutory provisions must be complied with;

    ii.     The majority of each creditor class fairly represented the class, acted in good faith and did not coerce the minority in order to promote the self-interests of the majority; and

    iii.     The scheme is such that "an intelligent and honest man, who is a member of the class concerned and is acting in his own interest, might reasonably approve."

(Sec. Manning Decl. ¶ 30-32.)

58.     The Cayman Scheme has been overwhelmingly accepted by creditors.  In

such instances, the Cayman Court will be reluctant to overturn the will of the creditor body.  (See

Sec. Manning Decl. ¶ 33).  Confirmation in the face of overwhelming acceptance by the creditor

body whereby all parties in interest have received substantial notice and the opportunity to voice

any objection to a plan presented in good faith is well within the fundamental principles of

chapter 11, and is certainly not "repugnant" to any portion of the Bankruptcy Code.

Furthermore, the Cayman Scheme provides for a *pro rata* distribution of consideration

comprised of a mix of cash, new debt and equity to each of the affected classes of Scheme

Creditors without impacting the rights of any of LDK Parent's secured creditors, all of which is

substantially consistent with the distribution scheme under chapter 11 of the Bankruptcy Code.

## IV.   Enforcement of the Cayman Scheme is Not Manifestly Contrary to Public Policy and, Therefore, its Enforcement Does Not Implicate Section 1506

59.     Pursuant to section 1506 of the Bankruptcy Code, the Court may refuse to

grant requested relief under chapter 15 if the action "would be manifestly contrary to the public

policy of the United States."  11 U.S.C. § 1506.  Courts have construed this public policy

exception narrowly.  See ABC Learning Centres, 445 B.R. 318, 335 (Bankr. D. Del. 2010)

(holding that section 1506 "exception is to be narrowly construed"); <u>Armada (Singapore) Pte Ltd. v. Shah (In re Ashapura Minechem Ltd.)</u>, 480 B.R. 129, 139 (S.D.N.Y. 2012) (stating that courts have "uniformly" read the public policy exception "narrowly and applied it sparingly"); <u>In re Brit. Am. Isle of Venice (BVI), Ltd.</u>, 441 B.R. 713, 717 (Bankr. S.D. Fla. 2010) (same).  The requested relief need not be identical to relief available in the United States, but it is required that the procedures utilized by the foreign court meet the "fundamental standards" of fairness.  <u>In re Metcalfe</u>, 421 B.R. at  697.

60.      Recognition and enforcement of the Cayman Scheme and Sanction Order is not manifestly contrary to public policy.  In determining whether to apply section 1506, courts have generally focused on two factors: (1) "where the procedural fairness of the foreign proceeding is in doubt or cannot be cured by the adoption of additional protections," or (2) where recognition "would impinge severely a U.S. constitutional or statutory right." <u>In re ABC Learning Centres Ltd.</u>, 728 F.3d 301, 309 (3d Cir. 2013); <u>see</u> <u>also</u> <u>In re Qimonda AG Bankruptcy Litigation</u>, 433 B.R. 547, 568-569 (E.D. Va. 2010) (same).  There is no question that Scheme Creditors received adequate due process and procedural fairness in the Cayman Proceeding, as illustrated by the following:

    i.    Prior to the Convening Hearing, on September 5, 2014, Scheme Creditors were provided with the Practice Statement Letter by (i) email, (ii) access to the Scheme Website, and (iii) notification to holders of Senior Notes via the Clearing Systems.  The Practice Statement Letter provided the date of the Convening Hearing and an invitation to Scheme Creditors to object to the restructuring proposal or proposed class composition by September 10, 2014 and attend the Convening Hearing.  (Sec. JPL Decl. ¶ 9).

    ii.    Each class of Scheme Creditors was invited to attend its respective Scheme Class Meeting, which were held in the Cayman Islands on October 16, 2014.  (<u>Id</u>. at ¶ 18).

iii.    Scheme Creditors have been notified of the date of the Sanction Hearing since notice of the Scheme Class Meetings was transmitted on September 17 via (i) email, (ii) the Scheme Website, (iii) the Clearing Systems, and (iv) publication in the *Cayman Compass* on September 23, 2014, and the *South China Morning Post* and the *Wall Street Journal* (including the International Edition) on September 24, 2014.  (Id. at ¶ 12).

iv.    Since being notified of the date of the Sanction Hearing, Scheme Creditors have had at least two opportunities to attend hearings in the Cayman Islands and object to the proposed restructuring: at the Convening Hearing and at the Scheme Class Meetings.   (Id. at ¶ 8-9).

v.    Scheme Creditors have had continuous access to all relevant documents, including a copy of the Cayman Scheme, via the Scheme Website for over two months prior to the Sanction Hearing. (Id. at ¶ 12).

61.    Ultimately, the Scheme Creditors have voted overwhelmingly to accept the Cayman Scheme, which itself is the product of good-faith, arm's-length negotiations spanning many months between the Consenting Noteholders, the Consenting Preferred Holders, the JPLs and other key stakeholders.  Recognizing and enforcing the Cayman Scheme will not upset the principles of fundamental fairness under U.S. law and, indeed, would further the key policy considerations of comity and recognition of a foreign court's insolvency powers where procedural fairness is evident.

62.    For the foregoing reasons, granting recognition of the Sanction Order under principles of international comity and section 1507 of the Bankruptcy Code is warranted.

## THE FOREIGN REPRESENTATIVES SHOULD BE ABLE TO TAKE ANY ACTION AND PERFORM ANY ACT NECESSARY TO IMPLEMENT THE CAYMAN SCHEME PLAN WITHOUT STAY.

63.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless

the court orders otherwise." The transactions contemplated under the Cayman Scheme and to be authorized pursuant to the Court's Enforcement Order must be consummated as soon as possible in accordance with the terms of the RSAs. To the extent that the Enforcement Order authorizes those transactions as use, sale or lease of property of LDK Parent, the Foreign Representatives request that any Order entered by this Court granting the relief requested herein be effective and enforceable immediately upon its entry.

## **NOTICE**

64.　No trustee, examiner or statutory committee has been appointed in this Chapter 15 Case. Notice of this Motion has been provided to (i) the Liquidation Committee, (ii) LDK Parent, (iii) the Internal Revenue Service, (iv) the Securities and Exchange Commission, (v) the United States Trustee for the District of Delaware, (vi) all parties who have filed a notice of appearance in this Chapter 15 Case and have requested notice pursuant to Bankruptcy Rule 2002, in accordance with Rule 2002-1(b) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, (vii) counsel to the JPLs in the Cayman Proceeding, (viii) counsel to the Consenting Noteholders, (ix) counsel to the Consenting Preferred Holders, (x) counsel to the Senior Note Trustee, (xi) the Senior Note Trustee, and (xii) the CN Trustee. In light of the nature of the relief requested herein, the Foreign Representatives submit that no other or further notice is necessary.

[***Remainder of Page Left Intentionally Blank***]

WHEREFORE, the Foreign Representatives respectfully request entry of the Enforcement Order, substantially in the form attached hereto, (i) granting recognition of and giving effect to the Cayman Scheme and the Sanction Order, and (ii) granting such other and further relief as the Court deems just and proper.

Dated: Wilmington, Delaware
November 3, 2014

SIDLEY AUSTIN LLP
Larry J. Nyhan
Jessica C.K. Boelter
Matthew G. Martinez
Geoffrey M. King
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Edmon L. Morton*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Maris J. Kandestin (No. 5294)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

COUNSEL TO THE FOREIGN REPRESENTATIVES
ON BEHALF OF LDK PARENT

01:16266978.1